Good morning, and may it please the Court. First of all, I'd like to reserve five minutes for my rebuttal. Okay. I'll try and help you. Thank you. My name is William Ginn from the law firm of Leverty & Associates in Reno, and I am here on behalf of the appellants, defendant and counterplaintiffs Robert and Gail Cimini, both in their individual capacity and as the judicial assinees of Energetic Lath & Plaster and Energetic Painting & Drywall. We typically refer to them as Energetic or the Energetic Entities. They were two companies that were owned by the same individuals that operated in conjunction with one another. And I take it they've just flat disappeared. Nobody knows what happened to them? They went out of business apparently in the 2008 construction mess, as did a lot of other businesses. They do still technically exist, I know, but beyond that I do not know. We've had some contact with the gentleman who owned the companies several years back, five years ago. But were they ever served with process in any of this litigation? Yes, Your Honor, they were served with process. There was actually the entire Nevada Supreme Court line on this case that dealt with that. They were served with the process on February 1st of 2012. In July of 2012, there's communication between the claims adjuster for Energetic and for the attorneys for Silver Star, who were the lead defendants in the underlying construction defect case. And in that, there's discussion of, hey, is this part of the other case? Is this part of the Hartman case? No, it's not. It's a completely separate lawsuit. Well, we're going to have to disclaim coverage. You do what you need to do. So Lexington covered the Hartman litigation but declined coverage on this litigation? Exactly, Your Honor. Okay. Approximately, I'm sorry? Go ahead and finish your answer if you had more on that. No, I'm. I have a few questions here. Yes. First of all, I want to make sure I understand a couple of your arguments correctly. The limits clause doesn't say that failure to pay the $25,000 is what determines whether the excess over $25,000 is covered. Instead, it says that, although the district court read it that way, instead what it says is that there's no duty to defend until the $25,000 is exhausted and that Energetic remains responsible for the $25,000 if it fails to pay it. Is that true? If I understand your question correctly, what you're asking is, is the duty to indemnify triggered by nonpayment of the SIR, the self-insured retention? Right. What I'm getting at is, is the coverage duty suspended until the insured actually pays the $25,000 or is the coverage duty just for the amount in excess of $25,000, regardless of whether it's paid? Well, the insurance policy is actually made up of two separate parts, which are roughly co-equal to one another. One is the duty to defend that the self-insured retention covers. And if the self-insured retention is not paid, there is no duty to defend. But the question is, what effect, if any, does that have on the duty to indemnify? Because I read that language the same way Judge Kleinfeld does. It seems to me that it only addresses the one but not the other. That's exactly our reading of it as well. The insurance company was in absolute control of the language. If they wish to exclude any indemnification requirements, then that's what they would do. As a matter of fact, under Section 4 of the actual policy itself, which is not modified by the SIR, it specifically says that this is primary insurance. And it doesn't do that. The theory is then that on the duty to indemnify, assuming the $25,000 has not been indemnified, is the amount of the loss up to the policy limit minus $25,000? Yes. Okay. Or even perhaps not even including the $25,000. That's an issue that wasn't raised below. But certainly, worst-case scenario for my clients would be the entire amount of the judgment minus $25,000. Now let me ask you another question. As I understand it, after the Simonees sued Silver Star and Silver Star sued Energetic, and there was a settlement or, I'm sorry, I misspoke, a judgment, what wound up happening is that the $456,000 that was left over and that is the subject of this claim, a court adjudication for $456,000, that's not for damage to the house because that was already settled. That's for the attorney's fees and expenses of the Simonees and of Silver Star, which was assigned to the Simonees. Is that correct? What the State Court decided was that the damages were damages to the home plus the assignment damages that were in there, which was $100,000, which was paid for the damages to the home, plus the attorney's fees and costs as was allowed under Nevada law under Chapter 40 at the time. I'm not asking for the justifications now. I'm just trying to find out what the present judgment is for. My impression was that it's not for damage to the home anymore. That's been settled. What it's for is the Simonees' own attorney's fees plus the Silver Star attorney's fees assigned to the Simonees. The judgment is for the $100,000 that was paid by Silver Star for damages. That amount was assigned back to the Simonees, plus there's attorney's fees. So it is for the damages to the house. It is for the damages to the house that were paid as a part of the underlying settlement. Okay. Thanks. Go ahead. Okay. The next issue, that was the first issue, was regarding the SIR and how the SIR, in our opinion, was improperly read and applied by the district court.  by making inferences in favor of Lexington in this case. One of them has to do with the intention of the parties and what the party's intention was regarding the terms of the contract, as we just discussed. Another one has to do with the August 24, 2012 letter. We call it a denial letter. Lexington calls it a reservation of rights letter. Well, it purported to be a reservation of rights letter, but there's a question as to whether, I guess, it came back to the insurance company. Is that right? It was never physically delivered to anybody from Energetic? That's an issue that we don't even know the complete answer to, Your Honor, because we weren't allowed to do any discovery on it. There's no evidence that Energetic received it. I thought there was evidence in the record, or at least in the claims adjuster file, that the letter came back as undeliverable. There is record in the claims adjuster file that the letter came back as undeliverable. What evidence do you have to refute that? Is that a material fact that's in dispute or not? It's not a material fact that's in dispute that that letter was sent out. It's a material fact that's in dispute as to what that letter was. That letter specifically says we're denying coverage. Oh, but if we're going to pick up coverage at some later point, then perhaps we're going to do all of this. And there was no reservation of rights letter that was sent when they actually picked up coverage. I think the court below looked at that argument and said, well, even if they'd sent a second letter, given the fact that the first one bounced back, it would have been futile to send a second one because Energetic had disappeared. Isn't that what the district court said? No, Your Honor. I believe that they said that they just said it was a reservation of rights letter and they didn't need to send a second reservation of rights letter when they began to defend, which is in violation of ample case law that's out there that says when you begin to defend, you must do this. Even if it's futile, you have to try. I guess my question is, as a practical matter, what difference does it make? Because there's no indication that had a second letter been sent, that it would have suffered any different fate than the first letter. There's no indication that had the second letter been sent, it wouldn't have been received either. Well, we know that the first one was not received as undeliverable. I thought the testimony by the claims adjuster was that he tried to contact, made several phone calls. The phone was disconnected, basically had no contact with the insurer from the time that letter was sent to the President. Isn't that the state of the record? Your Honor, excuse me. We don't know what the state of the record is. All we have is a single affidavit. Counsel, it's not a hard question. My question is, didn't the claims adjuster say, I tried several times to contact the insured and I got nowhere, no response? Yes, Your Honor, he did say that. And we filed a 56-D motion to allow us discovery to obtain the information that would support that statement. And what would that discovery have revealed? It would have revealed whether or not he even indeed did attempt to contact him when they did. And it also goes to the issue of – I think he testified, or is this just from the notes from his file? That's actually the statements. It's not even notes in the file. That's actually from their briefs where they say that. The only documentation that is in there is the declaration of the individual. Dick Shaw. Dick Shaw, thank you. But doesn't he say that in the declaration? He says I did, and then I didn't bother to try it again because I didn't think it would be successful. So that's the affirmative record, evidence that's in the record. And the best response you have to that is had we been given more time to conduct discovery, we might have been able to refute the truth of that accusation? Exactly. Is that your argument? Yes, Your Honor. Okay. We were not allowed to do so. We asked for discovery on that. It was all denied. We did not get to the point where we could even file a motion to compel because the motion for summary judgment had already been submitted. And you didn't note up the deposition of Mr. Shaw prior to the closure of discovery? We never even got to the close of discovery, Your Honor. When this motion was filed, we didn't even have finalized pleadings. Was there any discovery done at all? There was only the initial disclosures that were done, and that was it. Depositions were taken by either side? No, none. Okay. And I'm going to reserve the rest of my time. Do you want to save some time for rebuttal? Yes, please. Okay, thanks. Good morning, Your Honors. Good morning. Andrew Herold for Lexington. And as an initial matter, thank you for taking the time to hear us today. We always appreciate it. Well, it's an interesting case, but can you help us with regard to the interpretation of the self-insured retention? And as I understand it, the insurance company elected on its own to defend, did it not? Correct. Under the policy. So it didn't wait for proof that $25,000 was paid. It simply made a decision that they would provide a defense. Correct. The insurance company exercised its discretion to defend pursuant to the terms of the policy. That language was specifically attached to the ROR letter that you were just discussing, which was, you know, likely never read by anyone. Right. I have a question about this. It looked to me pretty clear that there was no duty to defend just a potential election until and unless Energetic paid the $25,000. But I don't see an exception or an exclusion from the duty to indemnify until and unless they pay the $25,000. What I saw that was relevant to paying the $25,000 on the duty to indemnify was that Energetic remains responsible for the $25,000, the self-insured retention, if it fails to pay it. The language of that indemnity clause, remains responsible if Energetic fails to pay the self-insured retention, suggests to me that the best inference from it is that the duty to indemnify survives, despite the failure to pay $25,000. It's just that you knock $25,000 off the total obligation. What's the matter with that? I understand that is the position that's been asserted by Energetic. Why is it wrong? I can't find policy language that supports your interpretation that paying the $25,000 is a condition precedent to any duty to indemnify. I know the district court went that way, and I can't find the policy language that supports it. Understood. The policy language starts at the top where it says self-insured retention endorsement, and then it states the limits of insurance apply excess of self-insured retention. Let's make sure we're both looking at the same clause here. That's EOR 71. Got it. Okay. The general rules on how that language has been interpreted. Are you talking about the language in defense and settlement? No. Above that. It's clause Roman 1, the limits of insurance clause? Correct. Okay. Where it says the limits of insurance as set forth in item 3 of the declarations, that was the million, right? Correct. And then it says shall apply excess of the self-insured retention, which is $25,000. Correct. Okay. I don't see where that implies anything one way or the other about whether it's a condition precedent. Understood. The California courts, and, in fact, this court, have dealt with this issue repeatedly. Well, wait. When you say California courts and this court have dealt with it repeatedly, I noticed that a lot of your citations were to unpublished dispositions, which, as you know, are not binding. We can't treat them as binding law. Understood. I'm referring to Forecast Homes v. Steadfast, which is the California Court of Appeal when citing Tekroski and the California Practice Guide, stating an SIR is the specific amount that must be satisfied before any coverage applies. Which case was that again? That's Forecast Homes v. Steadfast. Or as this court stated in the Pacific Employers v. Dominoes matter, it is well recognized that policies which are subject to an SIR have no duty to indemnify until the SIR is exhausted. Now, was the policy language in those two cases identical to the policy language in this case? Well, I'm going to say the courts, it's hard to glean that specifically from the decisions. That's a real problem for me because you really can't say what a particular insurance policy does on the basis of what other insurance policies do. Understood. Because they're not standard forms. The City of Oxnard and General Starr cases both deal with exactly this type of language where they say the limits apply in excess of an SIR and reach those conclusions. In addition, in the insurance company of the State of Pennsylvania v. Acceptance, it was the exact same language. Fentex v. Lexington was the exact same language. And the trial court in this matter reached the same conclusion on the exact same language. Counsel. Oh, sorry. Go ahead. Counsel, the problem I'm having with your argument is I'd like to refer you to page 72, the insolvency clause. Correct. Which makes clear that if the insured is unable to pay, it doesn't have any impact on the obligations under the policy. Correct. So the way I read that, and maybe I'm reading it wrong, is that if for some reason the insured just can't come up with the $25,000, the insurance company is not completely off the hook, which I think is your argument. Correct. And I would like to address that head-on. But I do think there's a difference between the duty to defend and the duty to indemnify. Agreed. And to hit that point head-on, that language is in there, I believe, by statute, which is that bankruptcy does not relieve an insurer of its obligations. That language has to be in the policy. That is the public policy of the State. If it has to be in there, it's in there. Yes. And it has the public policy of the State of California, and that deals with it. I have exactly the same problem that Judge Tallman does. When I read the relevant parts of that sentence, under insolvency, it says, your failure to pay the retained limit will not increase our obligations under the policy. And then it says, you will continue to be responsible for the full amount of the retained limit before the limits of the insurance under this policy apply. In no case will we be required to pay the retained limit. Now, when I read that clause, the word that jumps out at me is responsible. I'm responsible for paying my phone bill, whether I paid it or not. Responsible means it's my liability. And I don't see why the word shouldn't be read similarly here. They remain responsible for the $25,000, but that doesn't mean that they have to have paid the $25,000. Well, it says before the limits apply. Well, before the limits apply. Is it possible that you have to do a condition preceding to qualify for that to be show insolvency? It references your refusal to pay as well. Well, it says before the limits of the insurance apply. That's the million-dollar limit. That's the limits of this insurance. And why can't we give meaning to the last sentence of Clause 4 where it reads, in no case will we be required to pay the retained limit or any portion thereof as insured in bankruptcy can pay some portion of it. And, therefore, the insured doesn't increase its obligation or the insurer does not increase its obligations under the policy, but it doesn't excuse the insurer completely from any responsibility under the policy, does it? No, and that is going to circle back to my other point, which is this is not a judgment, credit, or action. Rather, this is the insured bringing a breach of contract action. Right. So this language is designed to protect judgment creditors in 11-580 actions. But your argument is essentially trying to read in, as Judge Jack put it, a condition precedent that triggers all obligations under the policy, which is the payment of the $25,000. And I just don't see the language in the policy that supports that argument.  Although I think that issue is kind of moot, given the insurer's voluntary decision to exercise its right to defend. So now we're simply talking about what are the limits, if any, on the duty to indemnify. I would say I would frame the question slightly differently, which is do the claimants herein have a breach of contract cause of action for failure to indemnify? That's the cause of action that is brought, and that's highly significant. To establish a breach of contract, you have to have contract. You have to have the plaintiff perform its obligations under the contract. These plaintiffs effectively breached multiple of their obligations. They did not give notice. They did not satisfy their SIR. They defaulted. Would you agree that had Energetic gone into bankruptcy and a judgment been entered against it so that there was a judgment creditor knocking on the door, in the face of this language, the insurer would still have a duty to indemnify, even though the bankrupt insurer would not be able to pay the SIR? I would say that that question is being wrestled with by courts in different ways and different fashions, and I don't actually know what the answer is going to be on that. Well, what's the purpose of the language of the insolvency clause if that isn't the effect of it? I mean, we have to give meaning to every portion of the contract. Correct. And you're asking me to read that entire paragraph out of the contract of insurance. In the context of a breach of contract cause of action, yes. I think because they are coming and saying that Lexington breached its contract, we're entitled to point to the fact that the plaintiffs, in fact, did not comply with their obligations under the contract, and they need to do that in order to state a claim for breach of contract. And notice the judgment creditor issue is a much more interesting convoluted issue, but that's not what's before the court. All I can see that is an important sort of breach that could bear on the duty to indemnify is failure to give notice. The reason for those clauses is usually to prevent collusive arrangements between the insured and the insurer where the insured confesses to a judgment that's very high and then assigns rights to the judgment in exchange for a covenant not to execute. But in this case, that really isn't an issue. Not only do I think it is. Well, the problem is the record seems to show without contradiction that the insurance company knew about the litigation because of the Hartman litigation sent a question to the exchange correspondence with the attorneys and knew about the Simony litigation. I think there's some loose terminology being used there. The right to repair statute is the claim that was presented by a different company to Lexington, not a suit. So that's entirely distinct. Lexington never got notice of a suit against Energetic. Energetic defaulted before Lexington got notice. But wait a second. I thought the Hartman litigation dealt with defective work on 11 other homes. And Lexington was involved in that litigation. And that was because Silver Star had cross-claimed against its subcontractors. In separate litigation. In separate litigation. And here, Silver Star had sued Energetic when it received notice from the Simony's that the work done on the home was defective. Have I got that right? No. No. Okay. The Simony suit is a separate suit. Yes. I understand. Simony action was served on Energetic. Energetic defaulted. Then Lexington got notice of the Simony suit. Right. If I'm looking at the right thing here, I see this e-mail from Marissa Poche to Dick Shaw, subject Simony versus Silver Star, you're insured Energetic. And it says, Hi, Dick. I am writing to request your attendance on behalf of Chartus at the upcoming mandatory settlement conference of this case, which is the Simony versus Silver Star case. And it gives them the date. And then says that I understand Chartus is not defending due to Energetic's unsatisfied self-insured retention of $25,000. So it looks as though the notice is there before the arguably collusive or your argument is that it's collusive judgment is entered. I don't see what's missing. It points to the word suit by a different company. It's not providing notice of the suit. Well, it says subject Simony versus Silver Star. Which is a different action. Oh, I'm sorry. Simony is the one we're talking about. But the Simony versus Silver Star is also the reference to the right to repair claim, not the actual suit. They would be called the same thing is my point. It says here it's a suit, Simony versus Silver Star. I understand she says that in the e-mail. My point is Energetic had already defaulted, had not given notice to its insurance company of that. But you still had notice in time to show up and prevent any collusive arrangement. We attempted to. The court rejected the efforts to intervene and allowed the judgment to proceed. But you didn't send anybody to the settlement conference. We did. There's undisputed evidence in the record that we did. I think you sent an adjuster but not a lawyer. Is that right? Correct. I would like to, if I could, I understand my time is almost up, to move to the breach of the implied covenant claims. These presented the rather interesting argument that summary judgment is never appropriate in bad faith claims. The underlying court did not agree with that, but it was an interesting argument, so we went and dug it up. We found 25 cases under Nevada law granting summary judgment on bad faith claims and found that the United States Supreme Court framework for summary judgment applies equally to those types of claims as to any other claim. Lexington presented evidence as the movement. The opposing party presented none. They earlier referenced that there was a 56D request. There was not on this summary judgment motion. There was one on the summary judgment motion several months earlier. The court properly granted summary judgment on that issue, which I'd be happy to answer any questions. I don't have any questions on the bad faith claim. Okay. Going back to the fundamental issue that the court has inquired about, which is the duty to indemnify. We would submit with the multiple breaches established by the plaintiff of their contract that there is, therefore, no ability for these plaintiffs to claim breach of contract. We would also submit that the language which states the limits apply excess of a self-insured retention has been found by many courts to make the duty to indemnify subject to that condition precedent. Okay. I think we have your argument in hand. Let's hear rebuttal from the other side. Thank you, Your Honors. First, there was some discussion there about when Lexington learned of the lawsuit. The Semeny's lawsuit was filed on October 26th of 2011. The e-mail ---- I'm sorry. Your voice trailed off at the end. I'm sorry. October 26th of 2011. The e-mails that were referred to as being in July of 2012, specific ---- Ms. Pachi specifically says to Mr. Shaw that Semeny is not a part of Hartman. It is the same project, but it is not a home in the Hartman case and is a totally separate lawsuit that was filed on Semeny. So it is the same. I mean, at that point, they very clearly were on notice of that. Their letter that comes out approximately a month later also specifically references the lawsuit in it. So they were clearly on notice of a lawsuit by that point. Approximately a week after that e-mail happened is when the default, the initial clerk's defaults were taken. The final default judgment was not until ---- well, the hearing wasn't until July of 2013. It wasn't until April of 2014 before the actual judgment came out.  And they had the power to defend, and they could have stepped in and to prevent the default. Absolutely. Now, let me ask you about something your opposing counsel said. He said there's a lot of authority, including California court of appeals case, that deals squarely with failure to meet the self-insured retention and its effect on the duty to indemnify. Could you speak to that? Certainly, Your Honor. Actually, what winds up happening, then, is if it is excess insurance, as Lexington argues, then it winds up being a coinsurance situation. And on coinsurance cases, the costs for both the defense and indemnity are allocated among coinsurers on a pro rata basis in proportion to the policy limits. So that's the Maryland casualty case, which is a California appeals court case, the Armstrong World case. I'm not sure you and I are talking about the same things. One kind of excess insurer is where there's a self-insured retention under an insurance policy, and the policy covers, say, up to a million. And then there's an excess insurer for the layer from 1 million to 10 million. Sometimes, there are multiple insurers, for various reasons, who have to share the burden of the case. But that doesn't come up in this case. Also, I don't really care what unpublished cases say or what cases from other jurisdictions say for purposes of our discussion right now. They may be enlightening, but what I want to know now is, is there a California court of appeals decision looking at similar language that says that the self-insured retention is a condition precedent? As was addressed in Lexington's arguments, it's very difficult to tell exactly what the language is from all of these policies. So the policies do not quote the relevant language? In many instances, they do not. And to be perfectly honest, I did not go through every single case that has been cited in here to try and figure out if it says it or not. Did you read the cases that your opposing counsel just cited to us to see whether they really do? Even if California law is that failure to pay the self-insured retention in a similar policy is a condition precedent that has not been met for the duty to indemnify, even if the policy language might appear to us not to support that, if that's California law, we're bound by it. Your Honor, the Pacific Employers v. Domino's pizza case, which you referred to, which was decided by this Court about 20 years ago, was a situation where they were trying to decide which policies even applied. Wait a minute. Wait a minute. You said decided by this Court. Yes. We have to follow California law under Erie. Yes, Your Honor. So I'm really interested in what California law is. And that was interpreting California law. It was a California case that had come through. This Court interpreted California's laws at that point. And the issue in that one, it was a car crash case, and Domino's being a huge corporation had multiple layers and multiple different types of policies, and which policy was there, which SIR had to be paid, how it was applied. The policy language was not included in that. But in that one, they did say that they did have to cover it. They just had to make sure that the proper policies had tracked through because there was notice issues and other issues. Maybe now you could add, turn your attention to the California court of appeals. Yes, Your Honor. I believe that was the Vaughn's case that he was referring to. We do not know what the language was in that one. I do not believe it is quoted at all in that policy. When we were preparing the briefing, I did look at it, but I don't remember seeing any language in there in specific. But in the Aetna Casualty Insurance Company, which is a 1976 California appeals court case, it's the ‑‑ if the primary coverage is not paid, the excess coverage still needs to pay, and that would be the SIR in this instance. It's Lexington's ‑‑ So you're saying Aetna goes your way. Aetna goes our way. Lexington's argument is the SIR is primary coverage. It's the first layer of coverage. It's the primary coverage. It's the primary insurance making theirs excess. Now, I disagree that the policy even says that. I have trouble calling it self‑insured retention primary coverage. I agree. I mean, it looks a lot more like a deductible to me. I would agree, Your Honor. And there's ‑‑ we could probably be here all day talking about the differences between ‑‑ You could say it's like primary coverage. It's like primary ‑‑ Like companies like to say we're self‑insured, which means they're not insured. Honestly, Your Honor, we could be here all day talking about the finding intricacies between all of these different types of policies. It's kind of like primary coverage. It's kind of like a deductible. It's kind of like a fronting policy. It's kind of like self‑insurance. Self‑insured retention is what it is. It's ‑‑ That's what it says. That's what it is. It's a self‑insured retention of the risk of loss. But if it were truly self‑insured, then the policy would say we have no duty to cover anything until this $25,000 is to be paid. The policy language specifically says in Section 4 that this is primary insurance. I don't know if you understand yet what my concern is. My concern is we have to follow California law. And I want to know what California law is with regard to the duty to indemnify when the self‑insured retention has not been paid. Period. All the cases I've ever seen on the issue, Your Honor, say that all address the duty to defend. They don't get to the indemnification issue. But then certain underwriters simply would say if you have no duty to defend, you have no duty to indemnify. That is actually an oversimplification of the statement, Your Honor. It is if you do not have a duty to defend because it does not fall within the scope of coverage, then there is no duty to indemnify. So if I have auto insurance and somebody slips and falls at my home, my auto insurer has no duty to defend me in that case because there is no potential for coverage. Any other questions? I think we are out of time. Thank you very much. Thank you both very much. The case just argued is submitted. Thank you very much. And we will be adjourned for the benefit of the high school students. Welcome. We're going to go back and talk about this case and the other cases that are on the calendar. Our law clerks are going to talk with you while we're conferencing. And then we'll come out and meet with you.
judges: Kleinfeld, Tallman, Jack